### NEW ENGLAND MORTGAGE SECURITY CO. *v.* GAY.

*(Circuit Court, S. D. Georgia.* January, 1888.)

1. **MORTGAGES—MORTGAGE COMPANIES—METHOD OF BUSINESS.**
The system of making loans on farms by the New England Mortgage Security Company and the Corbin Banking Company, through local loan agents, developed in evidence.

2. **NEGOTIABLE INSTRUMENTS—ACTION ON—DEFENSES.**
Where notes are given to one who is the president of a corporation, for money loaned by the corporation, and are by him indorsed in blank, the maker is entitled to any defense against the corporation that he has against the payee.

3. **USURY—WHAT CONSTITUTES—INSURANCE ON MORTGAGED PREMISES.**
Where property is conveyed to secure a debt, a stipulation that the borrower shall in addition to legal interest pay insurance premiums thereon is not usurious.

4. **SAME—PROOF.**
Usury may not be presumed, and must be shown by a preponderance of evidence.

5. **SAME—CORRUPT INTENT**
A "corrupt intent" to charge usury is an intent to get more for the use of the money than the law allows; and where the act is unlawful, and the lender did it or is responsible for it, the corrupt intent is sufficiently shown.

6. **SAME—AMOUNT OF LOAN—PRIMA FACIE RECEIPT—IMPEACHMENT.**
Under Code Ga. § 3807, providing that receipts for money are only *prima facie* evidence of payment, defendant may show that he received less on certain promissory notes made by him than the receipt shows.

7. **SAME—AGENCY IN MAKING LOANS—EVIDENCE—PAROL.**
A written or printed contract signed by the borrower, purporting to constitute a loan agent the agent of the borrower to negotiate a loan, is not conclusive where it is set up by plea that such contract was a device and contrivance to avoid the usury law, but evidence may be heard to show the real character and purpose of the instrument.

8. SAME—PROVINCE OF JURY.

Where G. had "territory" parceled out to him and other agents by the Corbin Banking Company, and contracted with their representative to work for them for 5 per cent., and to send the company 15 per cent. of all loans negotiated: they furnished him all blanks to carry on the business, required him to make them regular reports, to pay taxes on pledged farms, keep up a regular correspondence, report delinquents, collect interest and loans, and to reject all applications where the borrower would not sign the contract constituting him the borrower's agent, the banking company furnishing blanks for such contracts,—it was for the jury to say whose agent G. was.

9. SAME—NOTICE OF USURIOUS DEALINGS.

Where plaintiff had made 13,000 loans through a banking corporation, paying it nothing for its services, but receiving the amounts loaned in full, with interest, plaintiff is chargeable with notice of any usurious charges made by the bank; and the fact that the president of the bank is one of the plaintiff's directors is a fact to be considered.

10. SAME—CHARGES FOR EFFECTING LOAN—REASONABLENESS.

Where an agent, in the loan of his principal's money, exacts for his own benefit more than the lawful rate of interest, without authority from or knowledge of his principal, the loan is not thereby rendered usurious, nor is it usurious if the borrower truly and actually authorized the charge for expenses actually incurred or services actually rendered, if the charge is reasonable.

11. COURTS—FEDERAL—FOLLOWING STATE DECISIONS.

The courts of the United States, in suits between citizens of different states, are not bound by decisions of the state appellate court in the administration of a state statute where no question of construction is involved. This is especially true where the decision of the state court is not produced, and where the opinion has not been delivered or filed.

12. USURY—CHARGE FOR EFFECTING LOAN—REASONABLENESS—DEVICE TO EVADE USURY LAWS.

Code Ga. § 2057, provides that 8 per cent. shall be lawful interest; that any excess charged shall be forfeited; and that no contrivance between the parties shall avoid such forfeiture, except a full payment of the amount forfeited. Plaintiff's agent charged $1,700 for a loan of $8,500 to defendant, plaintiff being chargeable with notice of his act. *Held,* that the jury should determine whether that amount was a reasonable charge, authorized by the borrower, or a mere cloak for usury, and to be forfeited by the plaintiff.

(*Syllabus by the Court.*)

The New England Mortgage Security Company, plaintiff, sued Jacob M. Gay, defendant, on promissory notes to the amount of $8,000.

*Simmons, Hammond & Son,* for plaintiff.

*E. H. Hawkins, Du Pont Guerry,* and *Bacon & Rutherford,* for defendant.

SPEER, J., (*charging jury.*)   The plaintiff, the New England Mortgage Security Company, a corporation chartered by the state of Connecticut, has brought an action against Jacob M. Gay, a citizen of Georgia, and this district, upon certain promissory notes, of the apparent value of $8,500.   These notes are for different amounts, and they mature on the dates therein stated, and are all of the same form, as follows:

"$2,000.                           ELLAVILLE, GA., March 22, 1884.

"On the first day of December, 1885, I promise to pay Charles L. Flint, or order, at the office of the Corbin Banking Company, New York city, two thousand dollars, with interest, from this date at the rate of eight per cent. per annum, payable annually as per two interest notes hereto attached, value received.   And I hereby waive and renounce my right to the benefit of the

exemptions provided for by the constitution and laws of Georgia in all the property I now have, or may hereafter acquire, as against the payment of this note, and the interest notes hereto attached. Should any of said interest not be paid when due it shall bear interest at the rate of eight per cent. per annum from maturity, as stipulated in said interest notes, and upon failure to pay any of said interest within thirty days after due, said principal sum may, at the option of the holder of this note, be declared due without notice, and may thereupon be collected at once, time being of the essence of this contract, and in case this note is collected by suit I agree to pay all costs of collection, including ten per cent. of the principal and interest as attorney's fees.

"No. 35,144. JACOB M. GAY."

The coupons are in the following form:

"$110. ELLAVILLE, GA., March 22, 1884.

"For value received I promise to pay Charles L. Flint, or order, at the office of the Corbin Banking Company, New York city, one hundred and ten dollars, on December 1, 1884, being interest to that date on my note given to said payee, with interest from maturity at 8 per cent. per annum.

"No. 35,145. JACOB M. GAY."

These notes are secured by deeds of the defendant to his farm lands of the value of $22,000. The notes are made payable to the order of Charles L. Flint, and are indorsed in blank by him, and belong to the New England Mortgage Security Company. The plaintiff, however, with proper explanatory averments, could sue these notes if they bore no indorsement, because it is clear that they were originally and immediately on their execution the property of the plaintiff company; its money was given for them, and Charles L. Flint testifies that he is the president of the New England Mortgage Security Company, and made the loan for them. Charles L. Flint, in this transaction, and the plaintiff company are, therefore, identical, and are properly to be considered as one person. He testifies that he loaned no money but the money of the company. Whatever may have been his motive in taking the notes payable to his order, it was done in his official capacity as president, and the rights of the parties are in no measure complicated by the indorsement and apparent transfer before maturity, and the defendant, so far as those features are concerned, is entitled to make any defense that can be made to an action on a note in the hands of the payee. In this case Gay is the maker of the note, and, in view of the evidence, the New England Mortgage Security Company is the payee, and if the note truly expressed the transaction, it would read "payable at the office of the Corbin Banking Company to the New England Mortgage Security Company." This, therefore, was not a loan, as it appeared to be upon the face of the papers, made by Flint to Gay, with notes and deed made by Gay to Flint, completed, and then offered to the New England Mortgage Security Company, and bought by them as you might buy a note payable to bearer, but it was an application for a loan made through the Corbin Banking Company to the New England Mortgage Security Company and granted by that company.

Now, as I have said, the plaintiff is a corporation of the state of Connecticut. It is organized to lend money upon the security of mortgages

upon improved farms, and for similar purposes. The transaction, so far as it may be held legal, is within the scope of the plaintiff's corporate powers. The New England Mortgage Security Company, by that principle of comity existent among the states of the Union, is entitled to carry on its business with citizens of other states, and by means of contracts signed and to be enforced in other states; with this proviso, always, that should they extend their transactions to embrace contracts made in other states, they must take care to observe the laws of the state, made by its government for the welfare of its people. It is perhaps not improper to remark that, in the exercise of a lawful business, a foreign corporation is entitled to the same protection of the law, and the same even-handed justice, that self respecting courts and upright jurors accord to all men. There should be nothing but contempt for that juror who would deny to a corporation, because it is a corporation, any right that the law accords it. Upon the other hand, it is entitled to no immunity nor exemption from the penalties of the law, if by dishonoring the law it has deserved them. It has the same right to the fair and impartial administration of the law with every other citizen—no less and no more. I have said this much because the argument of counsel suggested it.

Now, to the rights of the parties in this dispute. When the plaintiff company exhibited to you and to the court the notes sued on, it became entitled to your verdict for the full amount, with interest, and 10 per cent. upon the principal and interest as attorney's fees. By that evidence, the plaintiff made what is called a *prima facie* case, and is entitled to the recovery mentioned, unless the defendant has made a defense which entitles him to have the plaintiff's demands reduced. Now, has such lawful defense been made? The defendant, Mr. Gay, admits that he is indebted to the plaintiff the sum of $6,463, with interest thereon at 8 per cent. from March 22, 1884, and costs of suit, and 10 per cent. attorney's fees upon the amount of principal and interest. And, without more mention, I charge you to return a verdict for that amount, which your foreman, who is an accomplished accountant, can readily calculate. This is the plaintiff's right, and this you will not deny him. In this connection I charge you further, that if you believe that Gay received $6,800, as insisted by Mr. Gorman, you are then directed to return your verdict for that sum, with interest at 8 per cent., and 10 per cent. attorney's fees thereon. If you find that the element going to make up the claim for $6,800 was insurance paid on the defendant's premises, with his consent, you will be justified in sustaining the plaintiff's demand for $6,800, because the insurance premium, in that event, was a lawful expense incurred in protecting the property conveyed to secure the debt. The defendant in that case received a valuable consideration in the protection of his property from loss by fire, and ought to pay for it.

The important question in dispute for you to determine is this: Shall you find for the plaintiff the balance of the demand in excess of $6,463 or $6,800, with interest on the same. Mr. Gay insists that he never got that difference; that his notes for $8,500, and his receipt admitting that

he did get it, do not speak the truth, and that the amount in dispute, whether it be the difference between $6,463 or $6,800 and $8,500, with the interest charged on said difference, is an usurious and illegal charge, which is forfeited by the express terms of the statute of this state prohibiting usurious contracts. In short, his plea is usury.

Now, what is usury? It may be defined to be "the taking of more for the use of money than is authorized by law, or the extortion of a sum beyond what is legal." That is the definition of Mr. Tyler, the leading text-writer upon this subject. It is otherwise defined as "the illegal profit which is required by the lender of a sum of money from the borrower for its use." The law condemns usury because it is held to take an unjust advantage of the necessities of the borrower. The true theory of government is intended to advance the greatest good of the greatest number of the people. The legislature, recognizing as true that no citizen can be prosperous, that no legitimate business can for any length of time be profitable with the habit of borrowing money at exorbitant interest, has enacted the usury laws. Chancellor KENT, an illustrious American jurist, in a celebrated decision in the court of errors in New York, declared that there was "scarcely any people, ancient or modern, that have not had usury laws." Lord REDESDALE, a great English judge, in 1 Schoales & L. 195, (*Drew v. Power*,) and *Molloy* v. *Irwin*, Id. 312, said: "The statute of usury is founded on great principles of public policy." Said he: "The statute of usury is constantly interposing its warning voice between the creditor and the debtor, even in their most secret and dangerous negotiations, and teaches a lesson of moderation to the one, and offers its protecting arm to the other."

Now, I have made these general observations because this law is not so well understood as are laws of more frequent consideration by juries, and because I wish you to understand the spirit of the law and its importance, and because argument upon its policy or impolicy have been addressed to you, or made in your hearing; because, also, of its importance you should be specially careful not to presume usury. The lending money on usurious contracts is a statutory offense and must be shown by a preponderance of evidence.

Now, what is the statute law of Georgia upon the subject of usury? The Code, § 2057, subsecs. *a, b, c, d,* and *e,* declares:

"Code, § 2057. (*a*) It shall not be lawful for any person, company, or corporation to reserve, charge, or take for any loan or advance of money or forbearance to enforce the collection of any sum of money, any rate of interest greater than eight per cent. per annum, either directly or indirectly, by way of commission for advances, discount, exchange, or by any contract or contrivance or device whatever. (*b*) Any person, company, or corporation violating the provisions of the foregoing section, shall forfeit the excess of interest so charged or taken, or contracted to be reserved, charged, or taken. (*c*) The amount of forfeit, as aforesaid, may be pleaded as a set-off in any action for the recovery of the principal sum loaned or advanced by the defendant in said action. (*d*) No contrivance or arrangement between the parties to any such unlawful transaction, or their privies, shall have the effect to discharge such forfeiture, except it be an actual and full payment of the amount so for-

feited. (e) All titles to property made as a part of an usurious contract, or to evade the laws against usury, are void."

Now, that is the law we are to administer. Now, to apply it to the facts in proof.

It is not disputed that the defendant gave his notes, conceding that he was handed $6,800, for $1,700 more than was actually paid him in money. If he was handed in cash $6,436, he gave his notes for $2,037 more than was paid him in cash as the proceeds of the loan. Now my figures are not to bind you. They are intended to be accurate, but all the facts in this case are wholly to be found by you, and you must make your own calculations. It is true that there is in proof Mr. Gay's receipt for $8,500, but that does not conclude him. It does not prevent him from denying that the receipt speaks the truth. The express language of the Georgia Code, § 3807 is "receipts for money are always only *prima facie* evidence of payment, and may be denied or explained by parol." That means that a receipt can be ignored if it is sufficiently shown by the testimony of witnesses that it does not recite the truth. Well, what became of this large sum which Mr. Gay, the defendant, was never paid in cash, although he gave his note for a sum sufficient to cover that, and the money he did get. The evidence is undisputed that a draft for $425 of that $1,700 was sent by the Corbin Banking Company to Mr. Gorman. He divided it with Mr. Bayne, his sub-correspondent, or sub-agent, as you may find, and the Corbin Banking Company, of New York, reserved, or charged and kept $1,275, and that is insisted by Mr. Gay to be a usurious charge in violation of the law of Georgia I have read you; that by the same law it is forfeited, and, therefore, and because he did not get it, he insists ought not to be compelled to pay it.

That brings us to the question, is it usurious? and if it is, is the plaintiff, the New England Mortgage Security Company, responsible for the violation of law, and does it, therefore, forfeit the amount and the interest on it? In other words, is the demand against Mr. Gay to be reduced by the subtraction of this amount, with interest on it, from the verdict you would necessarily, in the absence of this defense, render against him? Now, as I have told you, usury can never be presumed. It can never exist unless the money lender, or some agency for whose action he is in law responsible, has had the corrupt intent to take an illegal charge for the use of his money, and thus take an illegal advantage of the necessities of the borrower. You will ask, what do I mean by a corrupt intention? I mean an intention to get more for the use of the money than the law allows. Of course, if there is evidence to show a mistake, there can be no illegal intent, but if you find that clearly an illegal charge was made to affect the plaintiff, you can and must infer the intent to make it. Where the act is unlawful, and the lender did it or is responsible for it, the intent is sufficiently shown.

We take now another step. Mr. Gay not getting the cash which he insists he ought to have got, and insisting that to retain it was usury, how does the plaintiff meet this contention? The plaintiffs say they have nothing to do with Mr. Gay—they kept none of his money—they

v.33F.no.11—41

paid it over to the Corbin Banking Company for him, and if any illegal charge was made, that is a matter between Mr. Gay and the Corbin Banking Company and Mr. Gorman. Besides, they say no illegal charge was made; that Mr. Gay made Mr. Gorman his agent to negotiate the loan through the Corbin Banking Company, and all the plaintiffs did was to grant Mr. Gay's application, and lend the money on it when the Corbin Banking Company sent them the papers. Besides, the charge was a valid one, they insist, for the Corbin Banking Company and Mr. Gorman's commissions; and they put in evidence a paper or agreement which, on its face, made Mr. Gorman the agent of Mr. Gay, and they say: "See, Gorman was Gay's agent, and we are not responsible for the action of Gay's agent." Well, there is no doubt Gay signed that contract, and, indeed, all the papers, and if they are conclusive, Mr. Gay has no defense. Gorman and the Corbin Banking Company were Gay's agents, and he, because his agents maltreated him, cannot complain of a third party. If this was an ordinary question of agent and principal, with no reference to the question whether a public law has been violated, Mr. Gay's signature would state him out of court. But then, this law presents itself, and insists that you consider it.

"It shall not be lawful for any person, company, or corporation to reserve, charge, or take for any loan or advance of money, any rate of interest greater than 8 per cent. per annum, either directly or indirectly, by way of commission for advances, or by any contract or contrivance or device whatsoever."

So, then, gentlemen, a contract or agreement making an agent to negotiate a loan in a case like this, where the charge is that it is usurious, don't close the investigation. We must go further, and see whether it was a genuine contract, made with a substantial and actual purpose, on the part of Gay, to create Gorman his actual agent, responsible to him, and for whom he was responsible; or was it a mere cloak and a device to defeat the purpose of the people of Georgia, as manifested by their laws, to condemn and punish usury in this state, and thus get more for the use of money than is lawful. Now, in a case where this issue is involved, it is competent, and generally necessary, to go behind the written contract, for the plain reason that if that were conclusive, persons who desired to do so, when the necessitous applied for a loan, could, by well contrived instruments in writing, forestall all subsequent inquiry.

Well, now, was Gorman actually the agent of Gay? What was Gorman's main business? He tells you he was not the agent of the Corbin Banking Company, but he was the agent of Gay. That is his conclusion. Gay tells you he was not his agent, and that Gorman said he represented the Corbin Banking Company; that he did not employ Gorman as his agent; that he saw his advertisement; that he went to him for the loan; that Gorman mentioned Talbot and Taylor as the counties in which he operated, (by this is meant the territory parceled out for his business;) that after two days of negotiation between himself and Gorman, the papers were signed; that Gorman "fixed up the papers, and he, witness, signed them." The witness testifies further that Gorman's place of business was in Talbot county. Witness did not know whether he had any other

business; that the work he did in the transaction was to help fix up the papers; that Gorman did not go to Schley county, but witness met him with all the papers in Butler; that examination of papers consumed most of two days, and that Mr. Bayne, a young lawyer, "drew up the papers;" that his recollection was that Gorman said he kept the excess above the $6,436 for "incidental expenses;" that he signed the agreement after all the negotiations were made; that Gorman told him it was merely a formal agreement; that all the people he loaned money to signed it, so that he, Gorman, could get his pay from the company; that he always required persons borrowing money to sign that. Gorman, himself, was sworn for the plaintiff. He testified that since 1881 he has been engaged in negotiations for loans. That Gay signed all the papers. That the agreement in evidence is the entire agreement between himself and Gay. Gay applied to him to get the loan for him. He told Gay that the net amount of the loan would be $6,800; the gross amount $8,500. That 20 per cent. would be reserved, or about $1,700. That he had never had any communication with Flint or the New England Mortgage Security Company. That he was Gay's agent. That he prepared an abstract of title with the assistance of Bayne. That his commissions were $425; and that he divided with Bayne. After tracing title under the instructions given him by the Corbin Banking Company, he forwarded the papers to them. That the proceeds of the loan were sent to him in drafts inclosed to his address. That, by agreement with the Corbin Banking Company, they always retained 15 per cent. of every loan, and did in this case. That this was an unalterable rule. That after the loans were made he attempted to collect the interest, also looked after the payment of taxes on the lands, and exercised a general supervision over the welfare of the loans. But that he did this in the interest of his own business, and that this was the custom of the "correspondents" engaged in negotiating loans.

On cross-examination this witness testified that in the midsummer of 1881, he was approached by one J. V. Jarboe, who represented himself as an agent of the Corbin Banking Company. He was informed that Jarboe lived in Kansas City, Missouri, but was temporarily domiciled in Atlanta. Jarboe was traveling through the country. That Jarboe, as he remembers, solicited him to become a "correspondent" of the Corbin Banking Company (he does not remember that he used the word "agency") in the more eligible portions of the state, and he limited the territory of witness to the counties of Talbot and Upson. The relationship was consummated to the extent that the witness "began to negotiate." Jarboe had certain blanks with him. Shortly afterwards the Corbin Banking Company gave his arrangement with Jarboe a "semi-recognition," and wrote him that Jarboe had mentioned his name to them. Witness then began to represent them in Talbot and Upson. The blanks Jarboe had was an application and an agreement, substantially the same as those in evidence in this case. The agreement provided for receiving interest at 8 per cent., and the commissions. In all the blanks witness ever got from the Corbin Banking Company it was stipulated that he should be the agent of the borrower. That blanks were sent through the mail to

him in such quantities as he needed by the Corbin Banking Company. That the application now used is fuller as to the southern lands and southern features. That the Corbin Banking Company sent blanks for abstracts of titles, affidavits of ownership, and one containing printed questions relative to the standing and character of the borrower. The deed and bonds for title came back filled out, "and all we have to do," the witness said, "is to procure the signature of the borrower." They sent also an affidavit relative to the purchase of property in two years, noting the consideration and terms it was bought on, and every year a blank on which he was to note the payment of taxes or their non-payment. Did not report on the Gay case, because it was put in the territory of Mr. Felder, at Americus. The Corbin Banking Company allowed witness Troup county in exchange for Schley, and they would not let anybody else negotiate for them in this territory. His impression was the whole state was divided up into territory among the correspondents. That 25 or 30 of the correspondents met in convention at the Cotton Exposition in 1881. The convention was called by Mr. Dunton, cashier of the Corbin Banking Company, and Mr. Gay did not have a representative in that body. When the arrangement with Jarboe was made, the latter "indicated" to witness a compensation of 4 per cent., but the Corbin Banking Company sent him 5 per cent. on the first loan, and it remained 'that without explanation, they retaining 15. Jarboe told him the total commissions would be 20 per cent. and that amount was always retained from the borrower. It was fixed by "specific universal rule" before the borrower was connected with the transaction. The 20 per cent. never got into the possession of the borrower. He does not know who got the 15 per cent., nor for what it was retained, unless it was for the "blanks and clerical service and connection with moneyed men." Witness always told the borrower 20 per cent. would be reserved. It was for their acception or rejection. He never gave a borrower a receipt for the commissions. When borrowers were in default he was notified by the Corbin Banking Company, and a list of defaulters were sent to him. He was expected to look after them, and "induce" payment, but not collect it. Witness made reports of delinquents. He admitted writing a letter exhibited to him, and also in proof, in which he urged Gay to make an interest payment not yet due. This was, he said, "diplomacy by pressure sporadic." Witnes. supposed that Tussey was agent for the Corbin Banking Company. He acted in some capacity for them. Witness said in his territory he has made, he supposes, for the Corbin Banking Company, over a hundred loans. In all the same observances were made. The name of Charles L. Flint and the New England Mortgage Security Company constituted 25 per cent. of his loans. The others were scattered. The American Freehold Land Mortgage Company, of London, the American Mortgage Company, of Scotland, the Dundee Loan and Investment Company were the most conspicuous. Witness was never paid anything by the Corbin Banking Company. In all matters looking to the perfecting the title he was looking after the interests of the lenders. He had regular correspondence with the Corbin

Banking Company, and got regular instructions from them. In his territory he "put out" about $200,000. In this case of the Gay loan, and then afterwards, Bayne was the regular sub-agent or "correspondent" of the witness.

In addition to this evidence of the correspondent or agent through whom this loan was effected, certain letters of his between the Corbin Banking Company and himself, and between he and Tussey, were put in evidence. These are offered to contradict his statement that he was acting for the borrower, and not for the Corbin Banking Company. Judge Speer then read the following letters:

"Corbin Banking Company, New York and Boston.

"New York, November 3, 1883.

"Dear Sir: We have discontinued negotiating applications for Nelson & Barker. We propose to continue the business through you direct, 5 per cent. commission to you and 15 per cent. to us—you to make personal examination of each farm upon which a loan is wanted, and we to hold you responsible for representations regarding the same. If this is satisfactory advise us immediately by wire, and we will supply you with the necessary blanks.

"Yours, truly,  The Corbin Banking Co.
"*O. D. Gorman.*"

"Macon, Georgia, April 27, 1884.

"*O. D. Gorman, Talbotton, Ga.*—My Dear Sir: My Georgia assistant will visit your territory soon, for the purpose of looking up some of the business we have done through you, to get a general idea of what is being done in Georgia, and any information given or courtesies extended will be duly appreciated by  Yours, very truly,  S. D. Tussey."
"*M. J. H. Udell.*

LETTERS OF THE CORBIN BANKING COMPANY.

"Office Corbin Banking Company,

"New York, February 12, 1884.

"*O. D. Gorman, Esq.*—Dear Sir: I have yours of the 8th inclosing statistical reports of Talbot and Merriwether counties, for which thanks.

"Yours, truly,  W. G. Wheeler, Cashier, C. B. C."

"Office Corbin Banking Company,

"New York, February 21, 1884.

"*O. D. Gorman, Esq.*—Dear Sir: I am in receipt of the application of Jacob M. Gay for a loan of $8,500, and note that you have forwarded memorandum for inspection to Tussey. This is all right. The application looks certainly 'creamy,' and I hope he will report favorably.

"Yours, truly,  W. G. Wheeler, Cashier, C. B. C."

"Office Corbin Banking Company,

"New York, November 14, 1883.

"*O. D. Gorman, Esq., Talbotton, Ga.*—Dear Sir: I have your telegram of the 12th acknowledging our circular letter, and asking that we name the territory assigned to you. On the 13th we wrote you saying that you need not consider Troup and Merriwether counties in your territory, as they would be operated by parties in Atlanta. Since writing that letter I have reconsidered that question somewhat, and have decided to say to you now that you may operate Merriwether county, leaving Troup alone to the Atlanta parties. This, then, will leave your territory, as I understand it, Talbot, Merriwether,

Muscogee, Schley, and Upson. In relation to other territory surrounding you I would be glad to correspond with you concerning future business there, where it does not interfere with other correspondents. I sent you blanks yesterday, and hope to get some good business from you at once.

"Yours, truly,          W. G. WHEELER, Cashier."

### LETTERS OF GORMAN.

"TALBOTTON, GEORGIA, November 17, 1884.

"*Mr. Jacob M. Gay, Ellaville, Ga.*—MY DEAR SIR: In making my report on interest payments on loans, I would like to include yours, but cannot do so until I have been informed that you have paid your interest and instalment falling due December 1, 1884. Please to notify me by letter when you have so paid and oblige.      Truly your friend,     O. D. GORMAN."

"(*Private.*)

"TALBOTTON, GEORGIA, January 23, 1885.

"*Mr. J. M. Gay, Ellaville.*—DEAR SIR: I again call your attention to your interest now overdue on loan. Let me urge its immediate payment. It will save you trouble and expense. I commended the loan and you very highly, and I do not like to see you delinquent in a small matter of interest. Pardon me for saying to you, the company will proceed against you without further notice, if I do not hear from you in a few days.

"Yours, truly,          O. D. GORMAN."

"ELLAVILLE, GEORGIA, December 25, 1884.

"*Mr. O. D. Gorman*—DEAR SIR: Inclosed you will find a notice sent me by the Corbin Banking Company. Owing to a short crop, I will be unable to meet their demands this winter. I wish you would write on the back of this, the slip that it is necessary for me to write, as I do not exactly understand. Please return it to me and I will assign it, and forward it. I inclose stamp. I saw friend Tison yesterday, and he is anxious to hear from his application.

"Respectfully,          J. M. GAY."

On the back is written the following:

"The inclosed slip is a statement.

"TALBOTTON, GEORGIA, December 31, 1884.

"Let me hear from you immediately as to payment.

"*Mr. J. M. Gay,*—DEAR SIR: To December 1, 1884, you are overdue Corbin Banking Company $468.44, as interest, (on loan number 35,144.) This sum is now one month overdue. They expect you to pay it in accordance with your agreement, and the interest note of yours for this amount which you agreed to pay at maturity, December 1, 1884. The company have notified me that no extension will be granted this year, as you see this leaves you no alternative but to pay. I recommended this loan and you so highly to the company that they expected you to pay without fail. I do not wish them to be disappointed in you. So, Mr. Gay, take my suggestion, and, if you will excuse me, my advice, and get up the money and pay it. This is best and will save you an endless deal of expense and trouble. I know what I speak. Please do me the kindness to refer Mr. Tison to Mr. J. B. Felder, of Americus, who will attend to his application. ·    Yours,     O. D. GORMAN."

"ATLANTA, GEORGIA, December 18, 1884.

"*O. D. Gorman, Esq.*—MY DEAR SIR: On my delinquent list I find the following: Schley county.—No. 35,144. Jacob M. Gay, Ellaville, and 468.44, and now I want you to go for this 'old cus' in a good shape, and see that he

'ponies up' at once. We can't afford to have him slip up on this trifling amount in an $8,500 loan. If he cannot get there on a small amount like this, what in the devil is he going to do next year.

"Yours, truly, S. D. TUSSEY."

Mr. Estes was also introduced for the plaintiff, and, in the main, his testimony tended to corroborate that of Mr. Gorman. You will remember wherein it differed, and give it such weight as you think belongs to it. Does this evidence make Gorman the agent of Gay, so as to relieve the Corbin Banking Company of illegal contracts, if they were illegal in the business relations Gorman had with them? I charge you, gentlemen, that if you give full faith and credit to the agreement which Gay signed; if you believe that it was a genuine agency Gay intended to create, to take his interests in this matter in charge, and was an actual, valid, *bona fide* understanding, why it constitutes Gorman his agent.

In determining this you will consider: (1) That Gay denies it, you will consider on the other hand Gorman insists that it is true. (2) That the Corbin Banking Company prepared the form of agreement creating all these alleged agencies for the purposes of their business and sent it to their representatives whether they were called agents or correspondents. (3) That every borrower who dealt with them, so far as the evidence discloses, had to sign the agreement, or his application was rejected. (4) You will consider the contract with Jarboe, and its subsequent ratification by the Corbin Banking Company. (5) You will consider Gorman's letters to Gay in the interest of the Corbin Banking Company, and determine whether they show that Gorman was the agent of Gay or the agent of the Corbin Banking Company. It is within the province of the court to construe these letters for you, because it is the duty of the court to construe all written instruments; but they are plainly to be understood by you, and the court prefers not to place any construction on them, because they must be considered along with the evidence by parol, and therefore remits the whole question to you. (6) You will consider, in the same connection, Tussey's letter to Gorman, and the manner and language in which Tussey in that letter conveyed instructions to Gorman as to his duty in pressing payment from Gay. Gorman testified Tussey was acting for the Corbin Banking Company. (7) You will also consider what necessity there was for the formality and elaboration of the agreement, if it was merely a power of attorney from Gay to Gorman. What was the necessity for the explicit and prominent declaration that Gay constituted Gorman his agent? If there be no such necessity, you will attach to it such importance as it deserves, in that it may or may not tend to show that the agreement was a device and a contrivance, instead of a real and genuine document. (8) You will also consider that the Corbin Banking Company had a three-fourths interest in the proceeds of the agreement, and that Gorman had but one-fourth interest in it. You will see how far this circumstance will enable you to determine who was the principal and who was the agent in the transaction, and for whom Gorman and the Corbin Banking Company were acting. (9) You will consider the fact that the Corbin Banking Company furnished Gorman all

the blanks for carrying on the business, gave him instructions and he reported to them.

In this connection I charge you that the supreme court of the United States very recently decided (*Insurance Co.* v. *Edwards*, 122 U. S. 465, 7 Sup. Ct. Rep. 1249) that where an insurance company delivers to a person blank forms and affidavits for proof of death, and subsequently corresponds with him upon the subject, he is, as to persons dealing with him, the agent of the company, and they are bound by his action. In that case, as here, the counsel for the company made the point that the agency was special and limited, but the court held otherwise, and that the person to whom they had sent the blanks and corresponded with was their agent, and the company was bound by his action. · That is not precisely, however, a case analogous to this, but it illustrates the principle of law, in view of which you must consider all this evidence. Now, a corporation of another state, or other person, will not be permitted by the law to confer upon a person in this state the practicable and serviceable powers of agency, so that he can do all here that need be done to carry on the business, share in the illegal profits of the business, if they be illegal, and then repudiate the agency to escape the consequences. If, however, you give credit to this agreement as constituting Gorman or the Corbin Banking Company, the agents of Gay, and disregard the other evidence offered to show agency; if you find that Gorman rendered Gay actual and valid services; that he promised the compensation, and it was not a device to defeat the usury laws,—you should find for the plaintiff, principal and interest, with 10 per cent. attorney's fees and costs of suit. If you discredit the agreement which the Corbin Banking Company prepared, and which Gay and every other borrower had to sign; all except the testimony of Wheeler's denials, and the other officials of the Corbin Banking Company and the plaintiff; the conclusions and opinions and statements of motive of Gorman and Estes,—the rest of the evidence is fully consistent with the contention that Gorman was the agent of the Corbin Banking Company. That, however, gentlemen, is a question for your determination, not mine. Very well, if Gorman and the Corbin Banking Company are not the agents of Gay, the defendant, for whom do they act? As I have already told you, this loan was effected by Gay, through the Corbin Banking Company, directly with the plaintiff, because Charles L. Flint, under the evidence here, is standing in the shoes of the plaintiff. It seems that the application of Gay was sent by the Corbin Banking Company directly to the plaintiff, and, with many others, was accepted, and then the notes were made directly to Charles L. Flint, but really to the plaintiff company, of which he is president, as his testimony indicates. The plaintiff, however, does not send the money at once, but the Corbin Banking Company does not wait for that. It sends the money to pay Gay, and waits some time for the plaintiff to send it a check for the amount. That was alluded to in the argument to show agency. That does not necessarily follow, but it at least shows intimate business relationship and entire confidence. In the same letter, or a letter about that time, from the officer of the New England

Mortgage Security Company to the officer of the Corbin Banking Company, is a plain and rather imperative instruction to have all the other bonds for title of a certain class sent on in a certain form.

The testimony of the two "correspondents" or agents, Gorman and Estes, is that in every loan of the Corbin Banking Company, of which they have had any knowledge, this has been the fixed charge as commission, —of from 12 to 20 per cent. in excess of legal interest. Now, this is clearly, from the evidence, an enormous business. Mr. Flint, the president of the New England Mortgage Security Company, testifies that since the organization of the plaintiff company it has taken through the Corbin Banking Company 13,000 loans,—that is about 1,083 loans a year,—and as there are 308 working days in the year, leaving out Christmas, the first of January, the twenty-second of February, Thanksgiving, and the fourth of July, and also Decoration day, north and south, you can make the calculation and see how many loans there were each working day of the year. An average of over three loans for every working day in the year for thirteen years. I charge you, gentlemen, that with a business of money lending of that magnitude, carried on through a banking company where the relations are as intimate as the evidence discloses is the case here, the plaintiff company is presumed to know the system of the Corbin Banking Company, and the nature of the contracts of its own compensation for the trouble and expense of handling and placing the loan. That they render to somebody some service is undeniable; that the arrangement is profitable to the plaintiff may be reasonably inferred from the size and continuity of the business. The testimony is that the New England Mortgage Security Company has never paid the Corbin Banking Company anything. They get the principal back with full legal interest. Now, they must know that the Corbin Banking Company gets compensation somewhere, and, as so much of their business is transacted through the Corbin Banking Company, they are bound to inquire—to ascertain—if the compensation is not in violation of law, and if they are bound to inquire, and did not inquire, they are nevertheless chargeable with notice of all that they would have found out on due inquiry. If this duty did not rest on the plaintiff it would be always possible for the money lender to say to his broker: "Take my money. do what you please with it. Get all you can out of the borrower without any reference to the law. I will turn my back. I won't see it. Violate the law as much as you please, but don't call on me for any pay. Your services are valuable to me, but you must make the borrower pay you for them. But don't let me know what you do." Now the law will not permit such a transaction unless the charges of the agent are reasonable, and for real services to the borrower, and authorized by law. If you find, therefore, that the plaintiff for many years carried on a settled business through the Corbin Banking Company, paying them nothing and receiving legal interest themselves, I charge you that it was in that case the duty of the New England Mortgage Security Company to inquire as to the character of the Corbin Banking Company's transactions; and if you find from the evidence that they could have as-

certained the amount of the commissions the Corbin Banking Company were charging, I repeat, they were chargeable with notice of that which on inquiry they could have found out, and it would in that case be your duty to find that they knew the amount of commissions which the testimony indicates as the fixed and uniform charge of the Corbin Banking Company. In connection with your inquiry, whether the New England Mortgage Security Company could, on inquiry, have found out what this rate of commission charged was, you will consider the fact that Charles L. Flint, the president of the New England Mortgage Security Company, who was examined by interrogatory, made no explicit denial that he knew the rate of commissions charged by the Corbin Banking Company.

You will consider, also, that Austin Corbin, the president of the Corbin Banking Company, is a stockholder and a director in the New England Mortgage Security Company. This fact is not conclusive in itself, but it may be considered, and you will give to it such weight as you think it deserves. It is true, also, that even though the plaintiff company may not originally have authorized the Corbin Banking Company to act for them, still if the latter did act, and carried on a settled business for them, and the plaintiff continued the business by ratification, that may constitute the Corbin Banking Company their agent.

Now, if you find that Gorman is not the agent of Gay, but the agent of the Corbin Banking Company, and thus performs the functions of agency in placing these loans for the New England Mortgage Security Company, and, that the latter is, from intimate relationship or extensive and continuous business relations, or both, chargeable, under the rule I have given you, with knowledge of the commissions of 20 per cent. exacted by the Corbin Banking Company, the plaintiff is responsible for it. And but one other question remains, and that is, was the charge lawful and reasonable, or was it merely a cloak, device, or contrivance to charge for the use of money an amount in excess of the legal rate? Now, this proposition, which is true as a mattter of law: Where an agent in the loan of his principal's money, and the transactions connected therewith, exacts for his own benefit more than the lawful rate of interest, without authority from or knowledge of his principal, the loan is not thereby rendered usurious. I have submitted to you all I think proper as to whether Gorman and the Corbin Banking Company were in fact agents of the New England and Mortgage Security Company, and whether the New England Mortgage Security Company is chargeable with notice of the character of the business that was carried on by them. But even if the lender knows that the agent charges the borrower a commission in excess of legal interest, it does not render the charge usurious as to the lender, if the borrower truly and actually authorized the charge, and if the expenses were actually incurred and the service actually rendered, and if the charge is a reasonable one and the consideration meritorious; in other words, if it was a genuine contract, with an actual performance for a reasonable consideration. Now, were the charges reasonable in amount for services actually rendered or expenses actually incurred? The charges are 20 per cent. or one-fifth of the entire amount.

In this case it is $1,700, if Mr. Gorman is right, and something over $2,000 if Mr. Gay is right. The testimony of Gorman is that, in the territory he controlled, he put out $200,000. To loan that money at usual rate the Corbin Company charges would cost the borrowers $40,- 000. The reasonableness of the charges for services, and whether services were actually rendered, is a question for the jury. It is purely a question of fact, which men of business and experience are esteemed by the law more competent than a court to determine. It is a question of evidence. It is urged before you that this charge is reasonable as commissions, and has been recently so held by an elevated tribunal upon the ground, stated in its supposed decision, "that it would cost that much to go in person to New York or London for the money," and that these loan contracts are lawful throughout.

If this reported decision by the supreme court of Georgia was ever made, and is authentic, and there is no evidence that it is, the reasoning cannot control our judgment here. This court has a proper respect, it trusts, for the decisions of all courts whose authority controls, or whose reasoning commends itself to its intelligence and sense of justice, but, gentlemen, this court and this jury must decide this case upon the facts here; the law entitles us to do so. The facts nor the decisions of the *Merck Case*,[1] are before us. It is said that the decision will not be presented until the end of the term. But even if made in a case like this, we must do our duty as we see it, and the supreme court of Georgia must do their duty as they see it. The commissions in the *Merck Case* were $80, so far as the case is known; the commissions here are at least $1,700. The ground upon which it is said that the commissions in that case were reasonable was because it would cost that much for the borrower to go to New York or London to get the money; but it would cost no more for traveling expenses to go for a large sum than for a small one. Now, can the position be maintained that the traveling expenses of the borrower to and from New York or London are a fair criterion upon which to determine the reasonableness of the charge. But the amount of commissions vary with the amount of the loan. In the *Merck Case* they were $80, here they are $1,700. With great deference for the supposed judicial utterance of that court in the case referred to by counsel for the plaintiff, this court instructs you that whether the charge is reasonable depends upon the services actually rendered, the expenses actually incurred, the difficulties actually encountered by the agent in the service of the borrower upon the authority of the latter actually, and good faith given.

Now, gentlemen, were the legal services in passing the title actually rendered the defendant, and if they were, were they reasonable? What was the evidence upon the subject? What services did the Corbin Banking Company render the defendant, if they rendered any service to him? There is evidence relative to the services rendered in Georgia by Gorman and Bayne. What did the Corbin Banking Company do? It is all

[1] Opinion not yet handed down.

before you in the letters attached to the interrogatories of, I believe, Mr. Wheeler. They received the papers through the mail; they acknowledged their reception; they determined that the loan was "creamy," as appears in a letter from the cashier of the Corbin Banking Company; they forwarded the application to the New England Mortgage Security Company, and got a check of that company for the amount; they did not, however, wait for the arrival of that check, but sent the money, or a portion of it to Gay or to Gorman for Gay. Now, what was necessarily done in all this? They are not entitled to charge for the advances which they made to Gay before they got the money from the New England Mortgage Security Company because Gay contracts by his notes to pay 8 per cent. interest for that money and the notes were delivered and dated before he got any of it, so he could not be compelled to pay twice for the use of the money advanced and that is the only theory on which a charge for advances could be made during the same period. What else was done? The letter from Gorman to read; to read and to scan the papers; the letter to the New England Mortgage Security to write; to present the check of that company to the bank; to draw the drafts, fill out the blanks, (they didn't prepare the deed and the bond for title; they were prepared by the New England Mortgage Security Company.) For these services ostensibly to defendant, they charge him $1,275, if the services were rendered to the defendant, and the letter related to a number of other loans negotiated in the same correspondence. Now, was that a reasonable charge? Upon that subject you will remember the testimony of Mr. Cabaniss, the cashier of the Exchange Bank of Macon. He told you that such services were worth from 1 to 2 per cent.; that his bank would be glad to make such negotiations for that rate of compensation; and that it was not worth more. That would be between $85 and $170, or, at 2½ per cent., $212.50. This was exclusive of the legal services, inspection, etc., rendered here; but we are not considering them at present, but are confining our attention to the 15 per cent. of the Corbin Banking Company's commissions. Well, was there any evidence to contradict Mr. Cabaniss? If there was not you will then determine whether his testimony is worthy of credit and satisfactory. Well, if 1 or 2 per cent. is a reasonable charge for such services, is 15 per cent. unreasonable? That is a question for the jury. How much money is 15 per cent? That is fifteen dollars in every hundred. Why it is an easy calculation. Ten per cent. on this loan would be $850, 5 per cent. would be $425, add the two, 15 per cent. would be $1,275.

Now, is that a reasonable or an unreasonable compensation for such services as the Corbin Banking Company rendered? Let us see. A book-keeper or clerk or a conductor on a railroad, who has a salary of $100 a month, will have to work twelve months and three-fourths of a month for that much. We will take a federal judge. It is a matter of public law, and I can therefore tell you that the government declares that a federal judge—that is, a district judge—must work over 4 months before he has earned $1,275. Well, look at it in another view. Suppose the $8,500 were put out at interest at 7½ per cent. a year, how long

would it take the $8,500 to earn $1,275? Why two years. Well, let us take another view. How much money in government gold bonds, bearing 5 per cent. interest, must one have before his income therefrom for a whole year would be as much as the Corbin Banking Company charges for negotiating this loan? Why to have an interest income for a year for that amount, he must have in government bonds, $25,502. These figures, which are self-evident, are merely intended as illustrations, gentlemen, from which you may be enabled to get an idea of the value of money, and thus you could determine from the evidence whether 15 per cent. is a reasonable charge for such services.

Mr. Steed, a lawyer, a witness sworn for the defendant, testified that he was doing this kind of work, and had done a good deal of it for the Corbin Banking Company, or for the correspondent of that company. That such work was worth, conditionally or unconditionally, from $50 to $75. Mr. Hall, a lawyer, also testified. He thought the services were worth a great deal more, from three to four hundred dollars. On cross-examination, however, he testified that he had never got that much, and that he had never heard of any lawyer who had got that much for such service. He stated, moreover, that his estimation would be largely reduced if the fact be true that Bayne, who did the work, is a regular out agent of Gorman—Gorman testified that he was. You must determine from the evidence if the charge was reasonable.

Now, if the services were actually performed for the defendant at his request, if the commissions were for specific services, and actual expenses authorized by him, and if they were reasonable, they would not be usurious. If they were not performed for his benefit, at his request for specific services and actual expenses authorized by him, and if they are unreasonable and without meritorious consideration, you will be justified in finding that the charge is a mere cloak for usury, and the plaintiff forfeits the amount of such excessive charges; provided, it is connected with it, or responsible for it, under the instructions I have already given you upon that branch of the case.

Try this case, gentlemen, precisely as you would a case between two of your neighbors. You have been reminded of its great and far-reaching importance. The only effect this should have on you, should be to make you careful to do your whole duty to the parties; to give them the rights they are entitled to under the evidence and the law the court has charged you, nothing less and nothing more.

The jury found the commissions usurious.